1, 2, 3, 6, 7, United States v. Rivera-Ruperto a competency evaluation. He had dueling obligations, but certainly, if there was doubt, that was an obligation also. And my recollection is once the evaluation came in, when he was being evaluated the attorney told the government attorney that he was willing to take the plea. He did, Your Honor. He did go, but he sabotaged his own client by basically telling the prosecutors, yes, he wants to take the plea, but as you guys know, I mean, that's not his exact words, but there's testimony from the Lafler hearing where he admitted, yeah, he went to the government and said, yes, he wants to take the deal, but as you know, now we have this mental evaluation, and we'll be subject to, if he decides later on, coming back and saying, well, I really wasn't competent, and I guess he could have filed a 2255 or something against his own counsel. And he was more concerned about that than about trying to get this deal when his client is facing 160 years, when he could have gotten 12 year or something around the 12 years. As far as the Lafler issue goes, then they go to the hearing on the first day of trial, a Lafler motion is filed, and the trial judge just cuts him off right there, basically saying, the mental evaluation has nothing to do with this. I ordered that. Well, of course, in every case where there's a mental evaluation, it's the judge who orders it, but it wasn't the trial judge's idea to have the mental evaluation. It was defense counsel's mental evaluation. And the whole heart of the Lafler issue was, was that mental evaluation necessary? Why did he order it? And once his counsel, once his client wanted to take the 12 years, should he have tried to withdraw it? He had a very experienced trial judge who could have very easily made that determination in a Rule 11 proceeding whether this guy, the defendant, Mr. Rivera-Ruperto, had any real issues. He chose not to do that. He never presented it to the court. Counsel, give me a little bit more factual information on how the competency evaluation was ordered. Was that done in open court with your client present or not? No, Your Honor. A motion was filed by his counsel. I believe the counsel was expecting to have a local psychiatrist appointed to talk to Mr. Rivera-Ruperto. The judge decided to send him to Butner. He went to Butner. He didn't want to hear the evaluation. He was against it. He never claimed to be, have any mental issues. He goes to Butner. And I put this in my brief and I So was the competency evaluation ordered without a hearing? Was it, was it There was no hearing. There was a motion. To my recollection, there was no hearing. There was a motion. The government itself opposed it. Said there wasn't enough on the record to suggest that he needed a mental evaluation and that it was unnecessary. So they opposed it in writing or in a court proceeding? They opposed it in writing and in my brief. I don't have it. I can find it if you want me to, Judge. But we're seeing it in the brief, which is why I'm asking. It's in the brief in terms of the government opposed it. I'm trying to figure out if the judge laid eyes on your client. Typically, when such a motion is presented, the court has an opportunity to eyeball the defendant to see for itself if there's any indication that the defendant is showing signs of mental incompetency. That's what I'm trying to figure out, if there's anything like that that went on here. To my knowledge, no, Your Honor. But I wasn't the trial counsel. I don't see anything in the record that there was a hearing. I certainly didn't review any transcript. What I saw, and it's in my brief, it lays out the record that the defense counsel files the motion, the government files an opposition, the judge grants it and orders him sent to Butner. I don't believe there was a hearing. I could be wrong on that, but I don't recall that and I don't recall seeing any transcript. Counsel, in terms of the sequence of events, the 12-year offer was on the table locally, and then because of the mental evaluation, the time elapsed for taking that offer. Is that correct? So that was off the table, and then Washington becomes involved. But they still have an offer on the table. It's now, what, about 18 years or something like that? Is that correct? I believe it is. Just to complete the question, if I could, but the appellant refuses that offer. Isn't that correct? The mental evaluation is history. There's another offer on the table, but he rejects that one as well. Isn't that true? To be perfectly honest with the court, I believe the offer for the 12 years had already expired. Right. The motion for mental evaluation is filed several days later, and then when he comes back from the mental evaluation, now having been labeled a malingerer by Butner, and I don't understand their language or how they came to that, I don't know how you're a malingerer if you say I have no mental problems, and they send you to Butner because you have no choice, and now you're a malingerer for being there. And when they come back, they make the offer of 18, and yes, Your Honor, he doesn't accept it at that particular point in time. He gets, and then eventually he gets a second counsel. The counsel, that's when he files his Lafler motion. But again, as far as the Lafler issue, and that may be the only issue I get to address right now, but the heart of that argument is that he was not given a full Lafler hearing by the trial judge, because to do that, the mental evaluation, the questions that the court is asking are exactly the questions that need to be asked. Was it really necessary? Why did you do it? And then, you know, why didn't you come back when your client says, look, I want to take this offer and advocate for your client as opposed to, as I put in there, become consigliere for the trial judge, and you can't do that because you're going to come back against us all. So counsel, I would like to spend a little time on this sentencing manipulation argument. Could you reserve some time? Maybe we can go into that when you have time. I have plenty of time in the next argument as well. I forgot about that. I've got another ten minutes. That's true. All right. Thanks. Thank you. The hearing will go. I'm sorry? Oh, I'm so sorry. Good morning, Your Honors. May it please the Court, Robert Heberle for the United States. As the appellant's counsel mentioned, there are several issues at play in this hearing. One of them is the claims that he made regarding the Lafler issue, which was the first issue in their brief. To make this perfectly clear for the Court, there was a full and lengthy Lafler hearing before the District Court. The District Court heard from both the original counsel for the appellant as well as from the appellant himself. The District Court found that the appellant's counsel, the original counsel, was credible and that the defendant, now the appellant, was not credible. Based on the evidence that was introduced in that Lafler hearing, the sequence of events showed that there were essentially five different plea offers that were made to the defendant, each of which he was fully counseled on and each of which he knowingly and voluntarily rejected. To make the timeline clear for the Court, the first offer was made on November 10, 2010. That was a 14-year offer. And then the counsel for Mr. Rivera-Ruperto went to the government and successfully negotiated a reduction in that offer to 12 years, which the appellant's counsel agreed to. That was the first. Counsel for Mr. Rivera-Ruperto went to his client, explained to him the deal. Mr. Rivera-Ruperto explained to his counsel, I won't take 12 years. Eight years is the maximum I'll take. At that point, the attorney asked Mr. Rivera-Ruperto to sign a memorandum, essentially memorializing his decision, stating that I will take no more than eight years as a plea offer. I understand the consequences. I'm prepared to go to trial if I don't get a plea deal of eight years or less. Was there testimony as to whether he understood the sentencing exposure if he lost at trial? Yes, Your Honor, there was. Specifically, I would point to page 89 of the Lafler Hearing Transcript, during which Mr. Aguayo, who was the initial counsel for Mr. Rivera-Ruperto, reported that he advised Mr. Rivera-Ruperto of the maximum penalties that were available, including the penalties that would occur if he was convicted of the relevant 924C charges. According to Mr. Aguayo, Mr. Rivera-Ruperto's response to those instructions, that advice, was simply 12 years is too high. I won't take a deal for 12 years. To finish the timeline on the 12-year offers, Your Honor, by the way, the court initially mentioned that at some point there were new attorneys from Washington who came into the court, Mr. Rivera-Ruperto, and that was on February 3, 2011. That's at page 81 and 100 of the Lafler Hearing Transcript. That offer was set to expire on February 4, and the government informed counsel for Mr. Rivera-Ruperto that it would be filing an informative motion with the court on February 7, essentially stating that all plea offer deadlines have expired, and at this point the United States was preparing to go to trial. Mr. Rivera-Ruperto, however, was not prepared to go to trial because he again knowingly and voluntarily rejected that offer, saying that 12 years was simply too high. Subsequently, Mr. Rivera-Ruperto's attorney filed a motion for a mental evaluation, and the timing of events here I think is important, because the motion for a mental evaluation was filed on February 7. So by the time that motion was filed, the 12-year offer was off the record, indicating that the United States, after February 4, was willing to re-offer that deal. Indeed, there's affirmative evidence in the record indicating that the United States was not going to do that, given the informative motion it filed with the court in docket number 310CR342, stating that all plea offer deadlines have expired. At that point, the 12-year offer was gone. It was never offered again. Mr. Rivera-Ruperto's attorney filed this motion with the court seeking a mental evaluation, stating to the court that he had met with his client, that his client was refusing to look at discovery, that the client was ranting and raving, that he was becoming increasingly erratic, and that he was having conversations with imaginary people in the attorney-client visiting room. We submit that given those set of circumstances, it was entirely reasonable for Mr. Rivera-Ruperto's counsel to seek a mental evaluation from the court. And in fact, the court then did order that mental evaluation. As it turns out, what the mental evaluation found was that there were indications from the forensic tests that were done, or that Mr. Rivera-Ruperto was fabricating his psychiatric condition. But there was no way, and there's no evidence in the record indicating that Mr. Rivera-Ruperto's counsel would have had any way to discern that Mr. Rivera-Ruperto was fabricating those conditions. What he saw was someone who was experiencing what appeared to be serious psychiatric symptoms. And it was an entirely responsible decision by that attorney to seek the court to send Mr. Rivera-Ruperto away for a mental evaluation to determine whether he was competent to stand trial or to plead guilty. As the court noted, there were a couple of additional plea offers that were made in the case. There was an 18-year offer that was made by the government. That was in late 2011. Mr. Rivera-Ruperto, again, rejected that offer. And there was also an offer shortly before that in which the United States said, we'll accept a counteroffer in the range of 20 to 23 years. Mr. Rivera-Ruperto offered his counsel, this was around June of 2011, once he was back from the mental evaluation, to offer a deal at 13 years. And Mr. Rivera-Ruperto, again, rejected those offers. But by that point, the United States was no longer willing to accept a deal at that level. And he rejected the 20 to 23-year offer. So at this point, Mr. Rivera-Ruperto had been fully counseled on several opportunities to plead guilty. Those opportunities were opportunities he rejected. And he proceeded to trial knowing the potential penalties that he faced. And he was convicted on those charges and sentenced accordingly. With respect to the deficient counsel claim that Mr. Rivera-Ruperto now brings on appeal, it's not notable that he must show two things, both deficient performance and prejudice, which in the context of a Lafler claim means that he must show that there was some sort of change that would have occurred in the outcome of the plea process had he received sufficient or adequate counsel. In this case, he's failed to satisfy either problem because his attorney's credible testimony at the Lafler hearing indicated that he fully advised his client as to the consequences of these plea negotiations and the consequences of a refusal to enter into a plea. And then the record also indicates, with respect to prejudice, that by the time that this mental evaluation was requested, the 12-year offer, which is the sole focus of Mr. Rivera-Ruperto's Lafler claim on appeal, had expired and was off the table for good. So there's no way that he can establish either deficient performance by his counsel or prejudice on this very extensive record containing credibility findings for the district court, which are entitled, as this court has recognized, to great deference on appeal. One final point from the Lafler claim, Your Honors. I did note that there was a question, I believe, earlier as to whether once Mr. Rivera-Ruperto did note to his attorney that he wanted to accept the 12-year offer, this was after the mental evaluation was requested, whether or not his client's claim to the credible testimony in the record is yes. And I would point the court specifically to the hearing transcript. Well, I've lost the page. I apologize, Your Honors. But it's in there twice, where Mr. Aguayo, who is the attorney for Mr. Rivera-Ruperto initially, states that he did communicate to the Justice Department the fact that his client wanted to, after all, accept the 12-year offer. But at that point, the Justice Department was no longer willing to offer that deal. There's been some suggestion that perhaps if there were no mental evaluation here at all, then the Justice Department would have re-offered the 12-year deal. That, as my colleague stated in his testimony to the prosecutors, well, there's a mental issue here now, so perhaps you aren't going to be willing to enter into this agreement. To make this clear, under a Strickland claim, it is the appellant's burden to produce evidence showing that there was deficient performance and prejudice. And there is no evidence whatsoever in the record that the United States would have been willing to make this deal again after February 4th. That was the cutoff date and the deadline the United States filed its informative motion on February 7th, stating to the court, our plea offers are expired. And there is no indication whatsoever in the record that there was a possibility of making that deal again, regardless of what defense counsel stated to the prosecution in this case. Now, with respect to his second claim, which is sentencing factor manipulation, I wanted to address that briefly as well. Sentencing factor manipulation is a high burden to establish, and it is the defendant's burden to establish sentencing factor manipulation by a preponderance of the evidence. This court has repeatedly recognized that, by definition, sting operations always involve some level of manipulation. And so the question is not whether there's some degree of structuring of the transactions or establishing what amount of drugs is in play or whether weapons are present, but whether or not the government used some sort of intolerable or outrageous pressure, some sort of excessive misconduct to induce someone to engage in conduct that they otherwise would not have engaged in. And it's very relevant in this appeal that Mr. Rivera-Ruperto engaged in this conduct at issue, the drug transactions involving simulated cocaine, six times, five of which were at issue in the present issue. So as you describe the sentencing factor manipulation analysis, it sounds very much like an entrapment analysis. Is that the, in order to establish entrapment, the defendant has the burden, has to establish some kind of inappropriate, perhaps outrageous conduct by the government, also has to deal with the issue of the defendant's predisposition to commit the offense. The way you articulate sentencing factor manipulation, it sounds like it's really just another version of the entrapment issue. Is that your position, that they're really indistinguishable? It's not our position that they're indistinguishable, Your Honor, although we recognize that there are similarities. As this court itself has stated, the terms sentencing manipulation and sentencing entrapment can sometimes be used interchangeably. In its sentencing factor manipulation court cases, this court has stated that the primary consideration is whether there is excessive misconduct on the part of the government, whether there is outrageous or intolerable pressure. Well, look at what the defendant was being exposed to. You have six transactions. Well, now it's, we have other defendants on appeal here. The government moved against them, charged them after one instance. With this appellant, the government put him through six transactions, resulting in the exposure that we see here. Why isn't there something inherently outrageous about exposing this defendant to six of these charges when you had the goods on him after one time, knowing that the government was being charged immediately? Why is there no exposure to these extraordinary sentences? Why isn't that inherently outrageous? Yes, Your Honor. Let me clarify as to why these transactions occurred, why there were six transactions in this case. It wasn't the case that after each of these transactions, each person who was at issue in that particular transaction would be charged immediately. Rather, there was a long-term... But they could have been charged immediately, right? These are recorded and you had the goods on every one of them. Absolutely, Your Honor. And the reason why they weren't charged immediately is because the operation was ongoing and was identifying additional people who were participating in these crimes. And specifically, Mr. Rivera-Ruperto was a very eager recruiter for these operations. He brought in several additional people. And so each of these transactions, he was bringing in someone else. He brought in, for example, Ms. Nevado-Ramirez, who was the subject of a previous opinion issued by this Court earlier this year. He brought in several others when he would bring in for each additional transaction where he showed up an additional recruit. And so there was a legitimate law enforcement interest in continuing this operation where Mr. Rivera-Ruperto was identifying additional people who would commit these crimes. And I would point the Court specifically to its opinion in the Lucena-Rivera case where this Court stated that there are, that is a proper motive for continuing an operation where the government wishes to identify additional conspirators and to obtain additional evidence against those conspirators. Mr. Rivera-Ruperto was not someone who was brought into this hesitantly or who was somehow tricked into participating in these transactions. He was very eager to participate in them. And as this Court is aware from the transcript that we filed in our supplemental appendix from his first transaction, which is the subject of the co-appeal in this case but was also introduced as 404B evidence in the case, Mr. Rivera-Ruperto was very eager to obtain weapons for the conspirators. And in fact, later did in fact provide a .40 caliber semi-automatic pistol with an obliterated serial number to these purported drug dealers. He showed up time and time again, each time armed, each time knowing that what was at issue was large quantities of cocaine. And so over and over and over again he engaged in this conduct willingly and knowingly and identified additional people who would engage in these crimes who actually did in fact face future charges by the government. Before you run out of time, could you address the Allene issue? Yes, Your Honor. With respect to the Allene issue, in particular there are two issues. One dealing with the second or subsequent 924C conviction, which we think is controlled by Almendarez-Torres and this Court's decision in this case. And the beyond a reasonable doubt not being indicated that that finding had to be made. Yes, Your Honor. So there are two cases that have sort of been the center point of this argument in the briefs and in our 28J letter that we recently filed. The appellant's primary case that he relies on is the Delgado-Morero case. And he says that that case essentially establishes that in this case the jury deliberations were essentially bifurcated. The jury came back, delivered a guilty verdict as to the core elements of each offense and only then was sent back for an additional round of deliberation with very little instruction from the court to find drug quantities. And this court found in that case that that was insufficient, that there was plain error because the court had failed to instruct the jury to find those quantities beyond a reasonable doubt. But in this case, which we believe is far more analogous to the Dickerson case, which we cited in our recent 28J letter, there in fact was an intertwining between the elements as to the core elements of the, excuse me, the instructions as to the core elements of the offenses and the instructions as to the drug quantity findings. And so... The court in this case instructed the jury that it had to find him guilty beyond a reasonable doubt. It never instructed that it had to find him guilty beyond a reasonable doubt in each and every element of the offense. And it made no such reasonable doubt mention with regard to the drug quantity. What this court said in Dickerson, Your Honor, was that where there is a general instruction, as there was in this case... But is that general instruction in and of itself correct? Once again, the court didn't instruct that there had to be beyond a reasonable doubt in each and every element of the offense. Simply, the court said beyond a reasonable doubt he's guilty, period. Is that sufficient to say? Yes, Your Honor, I believe so. Because if you look at the very beginning of those jury instructions, the court instructed not only as to the general presumption of innocence, but also as to the fact that to establish guilt, the jury must make findings beyond a reasonable doubt. And there was no suggestion anywhere in the instructions that there was any lesser standard of proof that the jury should follow in establishing any fact that was at issue. The only standard as to which the jury was instructed was beyond a reasonable doubt. And as this court instructed in Dickerson, that is sufficient. And we would note as well that this is a plain error issue. This issue was not raised below. And so given Dickerson, there is no clear or obvious error here. In fact, it appears that the jury instructions had no error at all. Thank you, Your Honors. Thank you. We'll take a brief recess. Oh, you have two minutes. Quickly, in terms of the government's objection to the mental evaluation, it's at document 115. I didn't find anything regarding any hearing. And then with regards to Mr. Aguayo's testimony at the Lafler hearing, and then I'll get on to the Aileen issue and the sentencing manipulation, when he testified, and this is at the Lafler hearing, document 473 at page 98, I believe during all my conversations, I don't recall which prosecutor, but I did mention to them the fact that my client was saying this, that he wanted to accept a 12-year offer. And I also told them what the problem was, that if I would do this thing, request for mental evaluation, and he could later come back and say, look, I wasn't mentally competent. So that's my argument about he sandbagged his own client. He did technically tell the prosecutors he wanted to take the 12-year, but then he basically said, well, we can't do it because of the pending mental evaluation. Regarding the supplemental authority, my quick response to the Dickerson opinion is it's stale law. And the issue, it was pre-Aileen, and so the court has, in Delgado, recognized that there's been a change in the law since Aileen, and so I don't believe that it is controlling. And I believe there was an error, and in fact, the court found that when you look at Delgado, the jury instructions were almost identical. And the issue with Delgado, the reason this court reversed wasn't so much the bifurcation. Bifurcation was an attempt after the fact by the district judge to try and fix the problem. The reason it was reversed was there was no proper jury instructions to begin with. He didn't properly instruct them that they had to find the amount beyond a reasonable doubt, even though defense counsel had said it was a reasonable doubt. And that's why the bifurcation occurred. Thank you.